# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RAY GUTIERREZ; PATRICIA
GUTIERREZ; BRIANA TAPIA
and ALLAN TAPIA,

      Plaintiffs,

vs.                                                                                    No. CIV 20-0502 JB/CG

JUSTIN GEOFREDDO; BLAINE LATTIN;
JOHN AND JANE DOES 1-3, Deputy
Sheriffs 1-3 and JOHN AND JANE DOES,
and New Mexico State Police Officers 1-4,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Motion to Dismiss Complaint Based on

Qualified Immunity, filed June 2, 2020 (Doc. 7)("Motion").  The Court held a hearing on July 23,

2020.  <u>See</u> Clerk's Minutes at 1, filed July 23, 2020 (Doc. 17).  The issues are: (i)  whether Plaintiff

Ray Gutierrez has alleged plausibly a false arrest claim under 42 U.S.C. § 1983 as to Defendant

Deputy Blaine Lattin; (ii)  whether R. Gutierrez has alleged plausibly a false arrest claim or a

malicious prosecution claim under 42 U.S.C. § 1983 as to Defendant Deputy Justin Geofreddo;

(iii) whether Plaintiff Patricia Gutierrez has alleged plausibly a First Amendment of the

Constitution of the United States of America claim under 42 U.S.C. § 1983 against Defendant

Deputy John Doe; (iv) whether the Court should consider federal claims brought against the

collective group of the Defendants; and (v) whether the Court should remand the state law claims.

The Court concludes that: (i) R. Gutierrez has not alleged a plausible false arrest claim against

Lattin, because Lattin had probable cause to arrest R. Gutierrez for driving while intoxicated

("DWI"); (ii) R. Gutierrez neither has alleged a plausible false arrest claim nor a malicious

prosecution claim against Geofreddo, because (a) there was probable cause to arrest R. Gutierrez,, (b) R. Gutierrez does not allege that Geofreddo acted with malice, and (c) R. Gutierrez does not allege that Geofreddo caused his continued confinement or prosecution; (iii) P. Gutierrez has not alleged a plausible First Amendment claim, because she neither has described nor identified the officer that she alleges violated her right to film a police officer performing public duties; (iv) the Court will dismiss the claims in the Complaint, filed May 26, 2020 (Doc. 1-1), which refer to the Defendants as a collective, because the Complaint does not make clear exactly who is alleged to have done what to whom, and, therefore, does not provide each individual Defendant with fair notice of the basis of the claims against him or her; and (v) the Court will remand the state claims, because there are no remaining federal claims. Accordingly, the Court will: (i) grant the Motion; (ii) dismiss all federal claims against Lattin and Geofreddo; (iii) dismiss all remaining federal claims without prejudice; (iv) remand the remaining state claims and the case to the First Judicial District Court, County of Santa Fe, State of New Mexico; and (v) enter a separate Final Judgment in this matter.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint. The Court accepts the factual allegations as true for the purposes of the Motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(concluding that a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor"). The Court does not, however, accept as true the legal conclusions within the Complaint. See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

On September 28, 2019, R. Gutierrez, P. Gutierrez, Briana Tapia, and Allan Tapia attended the Santa Fe Wine and Chili Festival.  See Complaint ¶¶ 10, 12, at 2, 3.  The event ended at 4:00 p.m., and P. Gutierrez and B. Tapia went to the restroom while waiting for a valet to retrieve their car.  See Complaint ¶¶ 11, 12, at 2, 3.  Some women by the bathrooms started glaring and whispering about B. Tapia and P. Gutierrez; one of the women bumped B. Tapia very hard on the woman's way out of the restroom.  See Complaint ¶¶ 12-16, at 3.  As B. Tapia and P. Gutierrez were walking away, a woman grabbed B. Tapia by the neck and pulled her to the ground; the woman who had bumped into B. Tapia began to punch B. Tapia's head.  See Complaint ¶¶ 17, 18, at 3.  When P. Gutierrez pulled this woman off B. Tapia, the woman started to attack P. Gutierrez; meanwhile, another woman pulled P. Gutierrez' ponytail and "slammed her onto the floor." Complaint ¶ 20, at 3.  See id. ¶ 19, at 3.

A. Tapia, P. Gutierrez' son, heard his mother and sister calling for help, and he ran to their rescue; after separating A. Tapia and P. Gutierrez from their attackers, the three started running towards where R. Gutierrez was waiting.  See Complaint ¶¶ 22-23, at 4.  As they ran, P. Gutierrez and B. Tapia could hear that one of the attackers was calling for her male friends, and that this woman "was fired up, cursing, and screaming with so much anger."  Complaint ¶ 24, at 4.  P. Gutierrez "was screaming and crying out for help to Ray, that they had just been robbed." Complaint ¶ 25, at 4.  P. Gutierrez and B. Tapia were crying and screaming at R. Gutierrez, telling him that their attackers were still coming.  See Complaint ¶ 29, at 4.   P. Gutierrez had lent B. Tapia a necklace worth $4,500.00, and she then noticed that the attackers had stolen it.  See Complaint ¶ 31, at 5.

R. Gutierrez, in a hurry to leave the parking lot with his family and to get to a safe place, scraped the car next to him as he pulled out of the parking space.  See Complaint ¶¶ 26-28, at 4.

R. Gutierrez then spotted Geofreddo, a Deputy Sheriff, and stopped the car and approached him to ask for help.  See Complaint ¶ 32, at 5.  Deputy Sheriff Doe ordered R. Gutierrez' family out of the car, but he "did not seem to care" when A. Tapia explained that the women stole B. Tapia's necklace.  Complaint ¶ 35, at 5.  See id. ¶ 33-34, at 5.  R. Gutierrez had been separated from his family, and Geofreddo became angry and agitated at P. Gutierrez, A. Tapia, and B. Tapia as they were trying to get law enforcement to investigate the attack, and as they asked what was happening with R. Gutierrez.  See Complaint ¶¶ 37-38, at 5.  P. Gutierrez attempted to explain to a deputy sheriff that R. Gutierrez "was initially not the driver but was protecting his family," but another deputy sheriff told her to stay away.  Complaint ¶ 38, at 5.  Meanwhile, P. Gutierrez saw one of her female attackers and a man with her, "feet away from them cursing at them wanting to jump over the rails to get to them," but the sheriff deputies and New Mexico State Police officers did almost nothing to the aggressors.  Complaint ¶ 39, at 5.  The deputies and officers told the aggressors only that they would be arrested if they did not back away.  See Complaint ¶ 39, at 5.  Geofreddo did not speak with R. Gutierrez' family.  See Complaint ¶ 40, at 6.

B. Tapia began crying, because she wanted to explain her side of the story.  See Complaint ¶ 41, at 6.  A deputy sheriff threatened to arrest her if she did not calm down; A. Tapia asked the deputy sheriff why he would arrest her, and the deputy sheriff then handcuffed both of them and put in a pickup truck police unit.  See Complaint ¶¶ 42-45, at 6.  B. Tapia became scared that her mother was all alone, and P. Gutierrez tried to calm her at the truck's window.  See Complaint ¶¶ 46-47, at 6.  B. Tapia told P. Gutierrez that the handcuffs were too tight and hurt, but, when P. Gutierrez told a deputy sheriff this, the deputy sheriff told her to go to another area and stay quiet. See Complaint ¶¶ 47-48, at 6.  This area was near the "assailants that were trying to get through a barricade to get to Patricia."  Complaint ¶ 48, at 6.  P. Gutierrez tried to take a video, but "an officer

(NMSP, Deputy, Doe)" grabbed her arm, and told her to put her telephone away and sit on the curb. Complaint ¶ 49, at 7.

R. Gutierrez also spoke with deputies around the same time. See KRQE, Video: El Paso Judge's DWI Arrest in Santa Fe at 0:11, YouTube (Oct. 22, 2019), https://www.youtube.com/watch?v=7cSo7aU1RTM ("R. Gutierrez Arrest Video"); Complaint ¶ 65, at 8.[1] R. Gutierrez told the police that he "came to the wine fest with my family. We were leaving and, apparently, we hit this car." R. Gutierrez Arrest Video at 0:13. A police officer then asked Gutierrez, "How did you hit the car?" R. Gutierrez Arrest Video at 0:29. R. Gutierrez responded, "We were backing in and we hit him." R. Gutierrez Arrest Video at 0:32. Next, officers asked R. Gutierrez, "How much have you had to drink today?" R. Gutierrez Arrest Video at 0:36. R. Gutierrez replied, "I don't know. They were samples of glasses." R. Gutierrez Arrest Video at 0:39. The officers pressed R. Gutierrez for an answer, asking, "How many samples?" R. Gutierrez Arrest Video at 0:42. R. Gutierrez responded, "I don't know. Five." R. Gutierrez Arrest Video at 0:44. Geofreddo conducted a standardized field sobriety test on R. Gutierrez, which he passed. Complaint ¶¶ 56, at 7. See id. ¶ 55, at 7; R. Gutierrez Arrest Video at 0:48. R. Gutierrez was placed under arrest for "driving under the influence of alcohol and/or drugs." R. Gutierrez Arrest Video at 0:53.

---

[1]"In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)(citing GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)). Because the Complaint refers to the video, provides a citation to the video, and discusses the video repeatedly, the Court will consider the video for purposes of the Motion. See Complaint ¶¶ 65-74, at 8-9. The Court considers only the portions of the video showing R. Gutierrez' arrest, not the commentary by the news anchor.

A. Tapia also told R. Gutierrez to "say I was driving," in the officers' presence. R. Gutierrez Arrest Video at 1:00.  R. Gutierrez responded, "No, no, no."  R. Gutierrez Arrest Video at 1:01.  An officer interjected, "I saw it!  You can't say that you were driving."  R. Gutierrez Arrest Video at 1:02.  A. Tapia then told the deputy, "You can't, you didn't see shit!"  R. Gutierrez Arrest Video at 1:04.  R. Gutierrez instructed his son to, "Stop.  Just go ahead and go out.  Just bail me out, I'll see you when you bail me out."  R. Gutierrez Arrest Video at 1:10.  A. Tapia replied, "But I was driving."  R. Gutierrez Arrest Video at 1:16.  An officer then instructed, "Okay, let's go," and ushered A. Tapia away from R. Gutierrez.  R. Gutierrez Arrest Video at 1:17.

A deputy then inquired about a firearm that R. Gutierrez was carrying, asking R. Gutierrez, "Did you have this on you while you were drinking?"  R. Gutierrez Arrest Video at 1:24.  R. Gutierrez replied, "Yeah."  R. Gutierrez Arrest Video at 1:27.  An officer informed R. Gutierrez "you can't do that."  R. Gutierrez Arrest Video at 1:30.  R. Gutierrez began to respond, stating, "The way things are happening I just . . ." before a deputy stopped R. Gutierrez and told him to "sit down."  R. Gutierrez Arrest Video at 1:34.  R. Gutierrez was then taken into custody and received a breathalyzer test.  See R. Gutierrez Arrest Video at 1:40.  An officer states that Gutierrez' blood alcohol level was "0.10."  R. Gutierrez Arrest Video at 1:42.

R. Gutierrez  spent several days incarcerated, and P. Gutierrez' vehicle was seized and impounded "even upon her proof of ownership."  Complaint ¶ 51, at 7.  See id. ¶¶ 50, 61, at 7, 8. According to news media, there is a video of Santa Fe County Sheriff's Department deputies "huddled together to decide what to charge Ray with," but even during the criminal trial for this incident, R. Gutierrez never received this video.  Complaint ¶ 52, at 7.  R. Gutierrez was charged with taking a firearm into a liquor establishment, driving while intoxicated, and negligent use of a firearm.  See Complaint ¶ 54, at 7.

R. Gutierrez has a concealed permit to carry a weapon.  <u>See</u> Complaint ¶ 57, at 7.  Shell casings, unused rounds, pistol magazine, a holster, and a silver Ruger .380 CLP, were recovered from the scene.  <u>See</u> Complaint ¶ 58, at 7.  On January 6, 2020, the charges were dropped against R. Gutierrez, but New Mexico refuses to return his seized property.  <u>See</u> Complaint ¶¶ 59-60, at 7-8.  While a motion to release evidence has been filed, State's counsel Richard Wilson opposes the motion stating that this pending litigation is the reason for withholding the property.  <u>See</u> Complaint ¶¶ 59-60, at 7-8.

R. Gutierrez appeared before the Honorable George Anaya, Magistrate Judge for the Santa Fe County Magistrate Court, on October 1, 2019, and posted bond.  <u>See</u> Complaint ¶ 62, at 8.  On October 6, 2019, news outlets began reporting that R. Gutierrez had been arrested for a DWI, for possession of a firearm while intoxicated, and for possessing a firearm in a liquor establishment.  <u>See</u> Complaint ¶ 63, at 8.  On October 9, 2019, R. Gutierrez was arraigned, and the charge for possessing a firearm in a liquor establishment was dismissed.  <u>See</u> Complaint ¶ 64, at 8.  On October 22, 2019, KRQE, a dual CBS/Fox-affiliated television station in Albuquerque, New Mexico, ran a story that included a video of Ray sitting in the back of a police unit, but the video was never provided to the defense in discovery.[2]  <u>See</u> Complaint ¶¶ 65-66, at 8.

On November 1, 2019, the parties in R. Gutierrez' criminal trial conducted pre-trial interviews with the State of New Mexico's witnesses.  <u>See</u> Complaint ¶ 67, at 9.  Geofreddo stated that the video aired on October 22, 2019, was the video taken from his lapel of the arrest, that he turned the video into evidence, and that he did not know how the news obtained it.  <u>See</u> Complaint ¶¶ 68-70, at 8, 9.  Geofreddo stated that he saw P. Gutierrez and B. Tapia running toward R.

---

[2]The Plaintiffs include a youtube.com link to the KRQE story, which includes parts of the video.  <u>See</u> Complaint ¶ 65, at 8.

Gutierrez' car in great fear.  <u>See</u> Complaint ¶ 71, at 8.  KVIA-TV, a dual ABC/CW+ affiliated television station based in El Paso, Texas, stated it had seen three videos in total, but that, other than Lattin, all of the other State's witnesses indicate that they did not have lapel cameras.  <u>See</u> Complaint ¶ 72-74 at 9.  R. Gutierrez' defense counsel received Lattin's lapel video.  <u>See</u> Complaint ¶ 73, at 9.  The First Judicial District Attorney's office dropped R. Gutierrez' DWI charge upon hearing that Geofreddo saw B. Tapia and P. Gutierrez running towards R. Gutierrez' car.  <u>See</u> Complaint ¶ 75, at 9.  The parties could not resolve R. Gutierrez' charge for possession of a firearm while intoxicated, and so the case proceeded.  <u>See</u> Complaint ¶ 76, at 9.

At a December 23, 2019, hearing, the Honorable David Segura, Magistrate Judge for the Santa Fe County Magistrate Court, suppressed all evidence that was not turned over and "all witnesses that said evidence included."  Complaint ¶ 82, at 10.  The assistant district attorney at the hearing stated that, once Judge Segura signed the order, the district attorney's office would dismiss the case.  <u>See</u> Complaint ¶  83, at 10.  Although time was of the essence, because R. Gutierrez' job was at stake, and although Judge Segura signed the order on December 23, 2019, the district attorney's office did not dismiss the case until January 7, 2020.  <u>See</u> Complaint ¶¶ 84-86, at 10-11.  R. Gutierrez was fired from his Magistrate Judge position in El Paso County, Texas.  <u>See</u> Complaint ¶ 87, at 11.

<u>**PROCEDURAL BACKGROUND**</u>

Geofreddo and Lattin removed this case to federal court on May 26, 2020.  <u>See</u> Notice of Removal, filed May 26, 2020 (Doc. 1).  Two days after filing the Motion, Geofreddo and Lattin filed their Unopposed Motion to Stay Discovery Based on Qualified Immunity and Vacate Initial Scheduling Order, filed June 4, 2020 (Doc. 9)("Motion to Stay").  Shortly after the hearing, the Court granted the Motion to Stay.  <u>See</u> Stipulated Order Staying Discovery and Vacating Initial

Scheduling Order, filed July 28, 2020 (Doc. 18).  The Court sets out the other relevant procedural history below.

1.      **The Motion.**

Geofreddo and Lattin request that the Court dismiss the Complaint based on qualified immunity.  See Motion at 1.  They argue that the Complaint "does not contain allegations that plausibly allege that these officers, by their own individual acts, violated a constitutional right or committed a state-law tort."  Motion at 1.  They argue that, when an individual defendant asserts qualified immunity, the plaintiff must have enough evidence showing the defendant violated a constitutional or statutory right, and that said right was clearly established at the time of the allegedly unlawful acts.  See Motion at 2.  They state that, "unless plaintiff is able to prove both prongs of the test, defendant is entitled to qualified immunity."  Motion at 2.  They also assert that there is a mix of "factual allegations against numerous persons," some of whom are the named parties, some unidentified and unnamed -- like "'Defendant (Doe)'" -- and some who are identified and accused of wrongdoing, but are not sued, such as "'State's counsel Richard Wilson.'"  Motion at 3 (quoting Complaint ¶ 60, at 8).  They argue that the plaintiffs have used consistently only the collective term "defendants," without specifying who allegedly did what to whom.  Motion at 4.

As for the Plaintiffs' specific allegations against Geofreddo, Geofreddo and Lattin argue that the Complaint alleges only that that R. Gutierrez "'stopped the vehicle and went towards Deputy Sheriff Geofreddo for help,'" Motion at 4 (quoting Complaint ¶ 32, at 5), that he became angry as R. Gutierrez' family attempted to explain what had happened, see Motion at 4 (citing Complaint ¶ 36, at 5), that Geofreddo otherwise ignored R. Gutierrez' family, see Motion at 4 (citing Complaint ¶ 40, at 6), and that he conducted a field sobriety test on R. Gutierrez, see Motion at 5 (citing Complaint ¶ 55, at 7).  They also allege Geofreddo made oral statements during a

pretrial interview with the prosecutor and criminal defense counsel as part of the criminal case on November 1, 2019, a month after the material acts occurred.  See Motion at 5 (citing Complaint ¶ 67-75, at 8-9).  Regarding Lattin, Geofreddo and Lattin argue that the Complaint alleges only that he is "'employed by the Santa Fe County Sheriff's department and was on duty and acting under . . . state law at all times relevant to the complaint,'" Motion at 5 (citing Complaint ¶ 7, at 2), and that Lattin spoke with Geofreddo during the arrest, see Motion at 5 (citing Complaint ¶ 40, at 6).

Geofreddo and Lattin then argue that the Complaint's claims for relief are written "in bare, conclusory fashion."  Motion at 5 (citing Complaint ¶¶ 88, 95-96, at 11-12).  They argue that the Complaint also uses collective terms for "plaintiffs," even though many of the Plaintiffs did not suffer all of the injuries alleged in the Complaint.  Motion at 6.  They argue that, the Plaintiffs must "specify 'exactly *who* is alleged to have done what to *whom*.'"  Motion at 7 (quoting Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008))(emphasis in Robbins v. Oklahoma).  They assert that, "[i]n itself, the failure to differentiate among defendants (and the use of the collective term 'defendants') is grounds for dismissal."  Motion at 7 (citing Robbins v. Oklahoma, 519 F.3d at 1250; Matthews v. Bergdorf, 889 F.3d 1136, 1145-46 (10th Cir. 2018); and Pahls v. Thomas, 718 F.3d 1210, 1225-28 (10th Cir. 2013)).  They argue that the Plaintiffs "have not stated any remotely plausible claim that Geofreddo or Lattin, by their own individual acts, violated any constitutional right . . . or committed any of the torts alleged including malicious prosecution and/or libel and slander."  Motion at 8.

### 2. The Response.

The Plaintiffs respond to the Motion and oppose it.  See Plaintiffs' Response to Motion to Dismiss Complaint Based on Qualified Immunity, filed June 25, 2020 (Doc. 11)("Response").

They argue that they filed the Complaint in state court alleging only a violation of state law under the New Mexico Tort Claims Act ("NMTCA"), N.M.S.A. §§ 41-4-1 to -30.  See Response at 1.  The Plaintiffs contend that the Complaint satisfies the pleading standard for New Mexico state courts.  See Response at 1 (citing Zamora v. St. Vincent Hosp., 2014-NMSC-035, 375 P.2d 1243 (2014)).  Gutierrez and Tapia argue Geofreddo and Lattin removed the case to federal court to have them impose a pleading standard that exceeds Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  See Response at 2.  They argue that it is clear that Geofreddo and Lattin are responsible for R. Gutierrez' unlawful arrest and malicious prosecution, and that the Deputy Does 1-3, individually acting under the law, unlawfully detained A. Tapia and B. Tapia without probable cause.  See Response at 2.  The Plaintiffs state that, when the Does names are discovered, they will not receive qualified immunity.  See Response at 2.  They also argue that a New Mexico State Police officer violated P. Gutierrez' First Amendment right when she tried to film the encounter.  See Response at 2.  The Plaintiffs insist that P. Gutierrez' rights under the Fifth and Fourteenth Amendment to the Constitution of the United States were violated by taking her private property without due process of law.  See Response at 2.  The Plaintiffs say that they have not named individuals, because they do not yet know which officer is responsible for each particular deprivation.  See Response at 2.

The Plaintiffs argue their Complaint is "far from opaque" and that the issue is that the Defendants are seeking the "wrong remedy."  Response at 3.  They argue that the Tenth Circuit has held that the "complaint containing only conclusory allegations could withstand a motion to dismiss unless its factual impossibility was apparent from the face of the pleadings.'"  Response at 3 (quoting Mackley v. TW Telecom Holdings, Inc., 296 F.R.D. 655, 663 (D. Kan. 2014)(Sebelius, M.J.)(citing Robbins v. Oklahoma, 519 F.3d at 1246)).  They argue that the only

thing that could be missing from their NMTCA claims is a clarification how the individual actions violated the Plaintiffs' rights.  See Response at 3.  They argue that, for this issue, the "proper remedy" is to file a motion for a more definitive statement under rule 12(e) of the Federal Rules of Civil Procedure and not rule 12(b).  See Response at 3.  The Plaintiffs cite Martinez v. Naranjo, 328 F.R.D. 581, 593 (D.N.M. 2018)(Browning, J.), and argue that they are willing to amend their complaint to provide any further clarification.  See Response at 4-5.  They state that they have information only about all the officers who participated collectively, and the specific person or persons responsible for the deprivation of private property are unknown to them.  See Response at 5.

> **3.    The Reply.**

Geofreddo and Lattin reply to the Response.  See Reply Brief in Support of Motion to Dismiss Complaint Based on Qualified Immunity, filed July 6, 2020 (Doc. 12)("Reply").  They emphasize that the Plaintiffs do not address or mention qualified immunity in the Response, and contend that the Tenth Circuit condemns their use of collective terms such as the "Defendants," the "Officers," and the "Plaintiffs" in the context of qualified immunity.  Reply at 1. They also argue that, in Robbins v. Oklahoma, upon which the Plaintiffs rely, the Tenth Circuit reversed the denial of a motion to dismiss for qualified immunity and remanded with instructions to dismiss the complaint, "based primarily upon the complaint's repeated use of the collective term 'defendants' and its failure to 'isolate the allegedly unconstitutional acts of each defendant.'" Reply at 2 (quoting Robbins v. Oklahoma, 519 F.3d at 1250).  Regarding Mackley v. TW Telecom Holdings, Inc., to which the Plaintiffs also cite, Geofreddo and Lattin argue that it involves a motion to amend under rule 10 of the Federal Rules of Civil Procedure, and not qualified immunity or a motion to dismiss.  See Reply at 2.  They then argue that the Court in Martinez v. Naranjo,

another case that the Plaintiffs cite, states that "the federal courts disfavor motions for a more definite statement." Reply at 3. They say that no law requires defendants to file for a motion for a more definite statement rather than a motion to dismiss. See Reply at 3.

Finally, Geofreddo and Lattin state: "'[A] plaintiff must plead (by making specific allegations) that each Government official defendant, through the official's own individual actions, has violated the Constitution.'" Reply at 4 (quoting Ashcroft v. Iqbal, 556 U.S. at 676). They argue that the Plaintiffs have not "stated any remotely plausible claim" that Geofreddo or Lattin, by their individual acts, violated any constitutional right of any of the Plaintiffs family members, or "committed any of the torts alleged under the standards laid down by the Supreme Court and Tenth Circuit." Reply at 4.

### 4. The Hearing.

The Court held a hearing on July 23, 2020. See Transcript of Hearing (taken July 23, 2020)("Tr.").[3] The Defendants began argument by explaining that "a defendant sued in his individual capacity of course can only be held liable under 1983 for his or her personal individual actions and cannot be held liable or sued for the actions of other people whether a supervisor or not." Tr. at 3:17-21 (Dickman). The Defendants argued that, in the United States Court of Appeals for the Tenth Circuit, the law is "clearly established . . . that it is fatal for a plaintiff to use undifferentiated collective allegations." Tr. at 4:21-2 (Dickman)(citing Robins v. Oklahoma, Matthews v. Burkoff, Paul v. Thomas). The Defendants elaborated:

> What you see here is ubiquitous terms like the Defendants, the Officers, the Deputies throughout this Complaint. I think in the cause of action, Paragraphs 90 to 97, which is the actual cause of action, there's nothing but the use of the term Defendants . . . . I would point out interestingly [the Complaint's] use of [the] undifferentiated term Plaintiffs. I mean there are four individual plaintiffs who

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

> obviously had different things allegedly done to each one of them and throughout the didn't you see that as well.

Tr. at 4:14-24 (Dickson)(citing Complaint ¶¶ 90-97, at 11-12). The Defendants then identified the individualized allegations that the Plaintiffs made, and explained that none of them "meet the qualified immunity standard of showing a violation of the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment of the United States Constitution . . . ." Tr. at 5:20-22 (Dickson). The Defendants argue that the Plaintiffs ask the Court to speculate what the Defendant officers might have done. See Tr. at 7:18-24 (Dickson). The Court asked the Defendants whether R. Gutierrez was arrested for DWI, and the Defendants replied that R. Gutierrez was arrested after he failed field sobriety tests and breathalyzer tests. See Tr. at 9:12-17 (Dickson). The Court asked: "But don't the allegations in the Complaint state that he passed those tests?" Tr. at 9:22-24 (Dickson). The Defendants responded that "this is part of the problem," because, although the Complaint states that "Deputy Geofreddo conducted standardized field sobriety tests, and Ray passed the fields," another officer administered field sobriety tests which R. Gutierrez failed, and, therefore, the Complaint is "utterly inadequate in terms of giving a sense of what happened." Tr. at 10:1-21 (Dickson).

> The Plaintiffs admitted that it is
>
> hard to figure out what was going on throughout this course of events. But part of it is it was hard for my clients in that event to understand what was happening to them, what was going on because you had nine police officers as best we can tell interacting with them, moving away from them, talking to them, not talking to them, and you have this mishmash. And this is to the best of their recollection.

Tr. at 16:6-14 (Dunn). The Plaintiffs also explained that Complaint does not discuss the second field sobriety test and that, therefore, the Defendants should not be permitted to testify about that fact. See Tr. at 17:4-14 (Dunn). The Court asked the Plaintiffs whether there were "any facts that you now know and now that you're in federal court you would put in this complaint that's not in

there that I ought to be considering when I decide whether you state a cause of action under federal law?" and the Plaintiffs replied that there are no additional facts that the Court should consider. Tr. at 21:8-12 (Court, Dunn).  The Court asked the Plaintiffs what happened in this case, and the Plaintiffs agreed that the officers "arrested Mr. Gutierrez, and then they impounded the vehicle with the other three there."  Tr. at 24:8-20 (Court, Dunn).   The Plaintiffs continued that, when the police took the vehicle, this action "required Ms. Gutierrez who is from out of town . . . and her two children to hoof it until they could catch an . . . Uber after that."  Tr. at 24:15-18 (Dunn).  The Plaintiffs emphasized that the Defendants "deprived her of the vehicle . . . even though it was her vehicle and she showed her proof of ownership and could have drove away in her own vehicle." Tr. at 24:16-19 (Dunn).  The Plaintiffs admitted that they did not "know specifically which officers are responsible for that. . . .  We would like to figure that out through moderate discovery . . . ." Tr. at 25:6-9 (Dunn).

The Court next asked the Plaintiffs to clarify: "What is the malicious prosecution here? How is it different from the unlawful arrest?"  Tr. at 26:5-8 (Court).  The Plaintiffs asserted that their "point is that they took this prosecution and went ahead and took it to the District Attorneys after they made the arrest . . . and asked that this case be prosecuted."  Tr. at 26:18-21 (Dunn).

Following the parties' arguments, the Court explained how it would likely rule on this case:

> I am inclined to agree with the Defendants on dismissing a lot of the other plaintiffs and Ms. Gutierrez.  I'm inclined to agree with you, but the one [claim] that troubles me is . . . that [the Plaintiffs] got in there that [R. Gutierrez] passed all the field sobriety tests and then was arrested, and that these two officers were the ones that did it. . . . I'm wondering if that is sufficient to state a cause of action.  He was arrested without probable cause and you don't have to plead all your negative facts, but the positive facts that are pled, I'm wondering if that is sufficient.  I'm wondering what more I should require of a plaintiff to plead other than that he satisfied the field sobriety tests and was still arrested.  I wonder if I ought to be requiring more than that.  And I don't know what the more would be.

Tr. at 30:21-31:11 (Court).  The Court continued, addressing the Defendants:

I'm inclined to agree with you that the rest of these plaintiffs are probably too thin to go forward, but just focusing on . . . Ray Gutierrez, . . . I'm . . .thinking that [the Complaint] might be enough to cross the line if they prosecuted him for DWI, [without] . . . probable cause, [because] . . . he passed these field sobriety tests. I'm thinking that might be enough . . . . The others, it may be just too thin to go forward.

Tr. at 34:3-12 (Court). The Court reiterated that "most of the case should be dismissed," because "there's just not enough there." Tr. at 34:13-14 (Court). The Court noted, however, that it wanted to further consider "Mr. Gutierrez' claim on the unlawful arrest." Tr. at 35:15-17 (Court). The Court concluded that, therefore, it was "leaning towards" . . . ruling that "the motion should be granted in part and denied in part." Tr. at 35:18-20 (Court).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court of the United States of America deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). See Bivens, 403 U.S. at 392. "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.   To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "'hazy border[s]'" of the law.  Saucier v. Katz, 533 U.S. 194, 206 (2001)(quoting Priester v. Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.   Procedural Approach to Qualified Immunity.

The Supreme Court has discussed the proper procedure for lower courts to evaluate a

qualified immunity defense.  See Pearson v. Callahan, 555 U.S. at 236.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also notes that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[4] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[4]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, the Tenth Circuit interpreted Camreta v.

constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[5] "Courts should think carefully before expending

Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

[5]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified

immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief

shall not be granted unless a declaratory decree was violated or
declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense
in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for
constitutional violations where they reasonably believed that their conduct was
constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why
Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24
B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly
established" prong in reference to an officer's good faith and held that a
compensatory award would only be appropriate if an officer "acted with such an
impermissible motivation or with such disregard of the [individual's] clearly
established constitutional rights that his action cannot reasonably be characterized
as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow
v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly
established prong became a part of the qualified immunity test.  See 457 U.S. at
818 ("We therefore hold that government officials performing discretionary
functions generally are shielded from liability for civil damages insofar as their
conduct does not violate clearly established statutory or constitutional rights.").  It
seems ironic that the federal courts would restrict a congressionally mandated
remedy for constitutional violations -- presumably the rights of innocent people -
- and discourage case law development on the civil side -- and restrict case law
development to motions to suppress, which reward only the guilty and is a judicially
created, rather than legislatively created, remedy.  Commentators have noted that,
"[o]ver the past three decades, the Supreme Court has drastically limited the
availability of remedies for constitutional violations in" exclusionary rule litigation
in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J.
Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687
(2011).  Some commentators have also encouraged the courts to drop the
suppression remedy and the legislature to provide more -- not less -- civil remedies
for constitutional violations.  See Christopher Slobogin, Why Liberals Should
Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral
theory suggests that the exclusionary rule is not very effective in scaring police into
behaving. . . .  These theories also suggest that a judicially administered damages
regime . . . would fare significantly better at changing behavior at an officer
level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary
Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and
recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the
Supreme Court noted that civil remedies were a viable alternative to a motion to
suppress when it held that the exclusionary rule was inapplicable to cases in which
police officers violate the Fourth Amendment when they fail to knock and
announce their presence before entering.  See 547 U.S. at 596-97.  Rather than
being a poor or discouraged means of developing constitutional law, § 1983 seems
the better and preferable alternative to a motion to suppress.  It is interesting that

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[6]  See Camreta v. Greene, 563 U.S. at 707 (explaining that, "[i]n general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

**2.    Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he

---

the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[6]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz worked better.

or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 556 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "The operation of this standard, however, depends

substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, the Tenth Circuit explained that the relevant question concerning a police search of a home "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning," Hope v. Pelzer, 536 U.S. 730, 741 (2002), "but 'in light of pre-existing law the unlawfulness must be apparent,'" White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640)

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit has since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth

Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I") that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).   In concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.   Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.   We also relied on several cases resolving excessive-force claims.   But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.   The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case.   See Aldaba II, 844 F.3d at 874 n.1.   See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).   The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741[].   This calls to mind our sliding-scale approach measuring the egregiousness of conduct.   *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).   But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.   We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).   As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.   Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision.   See White v. Pauly, 137 S. Ct. at 551 (vacating Pauly v. White, 814 F.3d 1060 (10th Cir. 2016)).   In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the

clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640). With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552. See District of Columbia v. Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances."). Although the Supreme Court noted that "we have held that [Tennessee v.] Garner[, 471 U.S. 1 (1985)] and Graham do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham." 137 S. Ct. at 552.[7]

---

[7]If the Court is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established. As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). Although still stating that there might be an obvious case under Graham that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court and Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works. Many cases have so many facts that are unlikely to ever occur again in a significantly

- 26 -

similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials."  Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J.,

<u>**LAW REGARDING REMOVAL AND REMAND**</u>

If a civil action filed in state court satisfies the requirements for original federal jurisdiction -- meaning, most commonly, federal-question or diversity jurisdiction -- the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court "embracing the place where such action is pending."  28 U.S.C. § 1441(a).  See <u>Huffman v. Saul Holdings LP</u>, 194 F.3d 1072, 1076 (10th Cir. 1999)("'When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant or defendants may remove the action to federal court.'")(quoting <u>Caterpillar Inc. v. Lewis</u>, 519 U.S. 61, 68 (1996)).  In a case with multiple defendants, there must be unanimous consent to removal;

---

concurring)(internal quotation marks omitted).  The judiciary should be true to § 1983 as Congress wrote it.

  Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, <u>The New Qualified Immunity</u>, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, <u>see</u> Shannon M. Grammel, <u>Justice Gorsuch on Qualified Immunity</u>, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, <u>see</u>, <u>e.g.</u>, <u>Casey</u>, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, <u>see</u>, <u>e.g.</u>, <u>Perry v. Durborow</u>, 892 F.3d 1116, 1123-27 (10th Cir. 2018); <u>Aldaba II</u>, 844 F.3d at 874; <u>Rife v. Jefferson</u>, 2018 WL 3660248, at *4-10 (10th Cir. 2018)(unpublished); <u>Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana</u>, 2017 WL 3951706, at *3; <u>Brown v. City of Colo. Springs</u>, 2017 WL 4511355, at *8, and willing to reverse district court decisions should the district court conclude that the law is clearly established, <u>but see</u> <u>Matthews v. Bergdorf</u>, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); <u>McCoy v. Meyers</u>, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

a single defendant may spoil removal and keep the case in state court.  See 28 U.S.C. § 1446(b)(2)(A).  Only true defendants have removal rights: plaintiffs defending counterclaims and third-party defendants may not remove an action, and their consent is not required for removal if all the true defendants consent.  See Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642, 643-44 (2d Cir. 1993); Wiatt v. State Farm Ins. Co., 560 F. Supp. 2d 1068, 1078-79 (D.N.M. 2007)(Browning, J.).  "A plaintiff objecting to the removal may file a motion asking the district court to remand the case to state court."  Huffman v. Saul Holdings LP, 194 F.3d at 1076 (citing Caterpillar Inc. v. Lewis, 519 U.S. at 69).

To remove a case based on diversity, the diverse defendant must demonstrate that all of the usual prerequisites of diversity jurisdiction are satisfied.  Under 28 U.S.C. § 1332(a), a federal district court possesses original subject-matter jurisdiction over a case when the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00.  See 28 U.S.C. § 1332(a); Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1107 (10th Cir. 2000).  Diversity between the parties must be complete.  See Caterpillar Inc. v. Lewis, 519 U.S. at 68; Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004).  In addition to the original jurisdiction requirements, 28 U.S.C. § 1441(b)(2) lays out the "forum-defendant rule," which provides that a case may not be removed on the basis of diversity jurisdiction if any defendant is a citizen of the state in which the state-court action was brought.  The Tenth Circuit has noted:

> that § 1441(b)(2) -- the so-called forum-defendant rule -- provides as a separate requirement that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

Brazell v. Waite, 525 F. App'x 878, 884 (10th Cir. 2013)(unpublished)(alterations in original)(quoting 28 U.S.C. § 1441(b)(2))).  The forum-defendant rule applies to cases removed

under only diversity jurisdiction; a defendant may remove a case brought against it in its home state on the basis of federal-question jurisdiction. See 28 U.S.C. § 1441(b). Last, a case cannot be removed if it began with a nondiverse party or a forum-citizen defendant, and only later came to satisfy the requirements of removal jurisdiction, unless: (i) the plaintiff voluntarily dismissed the removal-spoiling party, see DeBry v. Transamerica Corp., 601 F.2d 480, 488 (10th Cir. 1979);[8] Flores-Duenas v. Briones, 2013 U.S. Dist. LEXIS 173620, at *12 n.6, *26 (D.N.M. 2013)(Browning, J.)(describing the operation of the "voluntary-involuntary" rule); or (ii) the removal-spoiling party was fraudulently joined or procedurally misjoined.

1.      **The Presumption Against Removal.**

Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome. See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982); Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 (D.N.M. 2009)(Browning, J.)("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand."). The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the evidence." McPhail v. Deere & Co., 529 F.3d at 953. See Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *4 ("As the removing party, the defendant bears the burden of proving all jurisdictional facts and of

---

[8]In DeBry v. Transamerica Corp., the Tenth Circuit explained:

The general effect of the [voluntary-involuntary] test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff. The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case.

601 F.2d at 488 (citation omitted).

establishing a right to removal."). See also McPhail v. Deere & Co., 529 F.3d at 955 ("It would have been more precise to say that the defendant must affirmatively establish jurisdiction by proving jurisdictional facts . . . ."). Because federal courts are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must deny such jurisdiction if not affirmatively apparent on the record." Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x 775, 778 (10th Cir. 2005)(unpublished), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014). This strict construction and presumption against removal should not, however, be interpreted as hostility toward removal cases in the federal courts. See McEntire v. Kmart Corp., 2010 U.S. Dist. LEXIS 13373, at *2 ("Strict construction does not mean judicial hostility toward removal. Congress provided for removal, and courts should not create rules that are at tension with the statute's language in the name of strict construction.")(citing Bonadeo v. Lujan, 2009 U.S. Dist. LEXIS 45672, at *12).

### 2. The Procedural Requirements of Removal.

Section 1446 of Title 28 of the United States Code governs the procedure for removal. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed." Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *5. A removal that does not comply with the express statutory requirements is defective and must be remanded to state court. See Huffman v. Saul Holdings LP, 194 F.3d at 1077. See also Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

Section 1446(a) of Title 28 of the United State Code provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together

with a copy of all process, pleadings, and orders served upon such defendant or defendants in such

action." 28 U.S.C. § 1446(a).  Such notice of removal is proper if filed within thirty days from the

date when the case qualifies for federal jurisdiction.  See Caterpillar Inc. v. Lewis, 519 U.S. at 68-

69; 28 U.S.C. § 1446(b).  The Tenth Circuit has further elaborated that, for the thirty-day period

to begin to run, "this court requires clear and unequivocal notice from the [initial] pleading itself"

that federal jurisdiction is available.  Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir.

1998).  The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose

a duty to investigate and determine removability where the initial pleading indicates that the right

to remove may exist."  Akin v. Ashland Chem. Co., 156 F.3d at 1036.[9]

---

[9]In 2011, Congress clarified removal jurisdiction and procedures in the Federal Courts Jurisdiction and Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011).  See Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5.

> On December 7, 2011, President Obama signed into law the Federal Courts Jurisdiction and Venue Clarification Act of 2011, which is intended to clarify the operation of federal jurisdictional statutes and facilitate the identification of the appropriate state or federal courts in which actions should be brought [see Pub. L. No. 112-63, 125 Stat. 758 (2011)].
>
> . . . .
>
> Section 103 of the Act makes several changes to removal and remand procedures. 28 U.S.C. § 1446 is amended to cover removal procedures for civil cases only; provisions governing removal of criminal prosecutions have been moved into new 28 U.S.C. § 1455 [Pub. L. No. 112-63, § 103(b), (c), 125 Stat. 758 (2011)].
>
> Section 103 of the Act also amends 28 U.S.C. § 1441(c) to provide that, on the removal of any civil action with both removable claims and nonremovable claims (i.e., those outside of the original or supplemental jurisdiction of the district court), the district court must sever all nonremovable claims and remand them to the state court from which the action was removed. The amendment also provides that only defendants against whom a removable claim has been asserted need to join in or consent to removal of the action.  [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)].

"When a civil action is removed solely under section 1441(a), [the standard removal statute, which excludes multiparty, multiforum jurisdiction,] all defendants who have been properly joined and served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).  The failure of all defendants to consent to removal will result in remand.  See Bonadeo v. Lujan, 2009 WL 1324119, at *5-6 (D.N.M. Apr. 30, 2009)(Browning, J.); McEntire v. Kmart Corp., 2010 WL 553443, at *4 (D.N.M. Feb. 9, 2010)(Browning, J.)("A notice of removal fails if this procedural

---

Section 103 also amends 28 U.S.C. § 1446(b) to provide that, in a multi-defendant case, each defendant will have 30 days from his or her own date of service (or receipt of initial pleading) to seek removal.  Earlier-served defendants may join in or consent to removal by a later-served defendant [Pub. L. No. 112-63, § 103(a), 125 Stat. 758 (2011)].  These provisions are intended to resolve a circuit split over when the 30-day removal period begins to run in cases in which not all defendants are served at the same time [see H.R. Rep. No. 112-10, at 13-14 (2011); see, e.g., Bailey v. Janssen Pharm., Inc., 536 F.3d 1202 (11th Cir. 2008)(30-day period runs from date of service on last-served defendant, and earlier-served defendants may join in last-served defendant's timely removal); Marano Enters. v. Z-Teca Rests., LP, 254 F.3d 753 (8th Cir. 2011)(each defendant has 30 days to effect removal, regardless of when or if other defendants have sought to remove); Getty Oil Corp. v. Ins. Co. of N. Am., 841 F.2d 1254 (5th Cir. 1988)(first-served defendant and all then-served defendants must join in notice of removal within 30 days after service on first-served defendant)].

Section 103 also enacts a new subdivision (c) of 28 U.S.C. § 1446, containing provisions governing the procedures for removal.  These include new authorization for a notice of removal in a diversity case to assert the amount in controversy if the initial pleading seeks (1) nonmonetary relief, or (2) a money judgment when state practice either does not permit a demand for a specific sum or permits the recovery of damages in excess of the amount demanded.  Also part of a new subdivision (c) of 28 U.S.C. § 1446 is a provision allowing removal of a case based on diversity of citizenship more than one year after commencement of the action if the district court finds that the plaintiff acted in bad faith in order to prevent a defendant from removing the action (such as by deliberately failing to disclose the amount in controversy) [Pub. L. No. 112-63, § 103(b), 125 Stat. 758 (2011)].

Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 n.5 (quoting 16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107SA-1 to 107SA-2 (3d ed. 2013)).

requirement is not met."). The rule of unanimity applies to all defendants, whether they are required parties under rule 19 or merely proper parties under rule 20. See Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 (10th Cir. 1998)(stating that the general removal rule "require[s] all defendants to join in the removal petition"); Cornwall v. Robinson, 654 F.2d 685, 686 (10th Cir. 1981)("A co-defendant, Interstate Book Company, did not join in the petition for removal and the petition was thus procedurally defective."); Bonadeo v. Lujan, 2009 WL 1324119, at *5 ("Although the procedure for a notice of removal set out in 28 U.S.C. § 1446(b) is couched in terms of a single defendant, courts have held that all defendants must join a removal petition or removal will be defective.")(citing Cornwall v. Robinson, 654 F.2d at 686). The defendants who have not been served, however, need not join in removal. See Kiro v. Moore, 229 F.R.D. 228, 230-32 (D.N.M. 2005)(Browning, J.).

   **3.    Amendment of the Notice of Removal.**

   In Caterpillar, Inc. v. Lewis, the Supreme Court held that a defect in subject-matter jurisdiction cured before entry of judgment did not warrant reversal or remand to state court. See 519 U.S. at 70-78. Citing Caterpillar, Inc. v. Lewis, the Tenth Circuit has held that "a defect in removal procedure, standing alone, is not sufficient to warrant vacating judgment and remand to state court if subject matter jurisdiction existed in the federal court." Browning v. Am. Family Mut. Ins. Co., 396 F. App'x 496, 505-06 (10th Cir. 2010)(unpublished). In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998)(Easterbrook, J.), the United States Court of Appeals for the Seventh Circuit noticed, on appeal, defects in the notice of removal, including that the notice of removal failed to properly allege diversity of citizenship. See 150 F.3d at 653 ("As it happens, no one paid attention to subject-matter jurisdiction . . . ."). The Seventh Circuit nevertheless permitted the defective notice of removal to be amended on appeal to properly establish

- 34 -

subject-matter jurisdiction.  See 150 F.3d at 653-54.

The Tenth Circuit has allowed defendants to remedy defects in their petition or notice of removal.   See Jenkins v. MTGLQ Investors, 218 F. App'x. 719, 723 (10th Cir. 2007)(unpublished)(granting unopposed motion to amend notice of removal to properly allege jurisdictional facts); Watkins v. Terminix Int'l Co., 1997 WL 34676226, at *2 (10th Cir. 1997)(per curiam)(unpublished)(reminding the defendant that, on remand, it should move to amend the notice of removal to properly allege jurisdictional facts); Lopez v. Denver & Rio Grande W. R.R. Co., 277 F.2d 830, 832 (10th Cir. 1960)("Appellee's motion to amend its petition for removal to supply sufficient allegations of citizenship and principal place of business existing at the time of commencement of this action is hereby granted, and diversity jurisdiction is therefore present."). The Tenth Circuit has further reasoned that disallowing amendments to the notice of removal, even after the thirty-day removal window had expired, when the defendant made simple errors in its jurisdictional allegations, "would be too grudging with reference to the controlling statute, too prone to equate imperfect allegations of jurisdiction with the total absence of jurisdictional foundations, and would tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases properly committed to federal courts."  Hendrix v. New Amsterdam Cas. Co., 390 F.2d 299, 301 (10th Cir. 1968).  The Tenth Circuit has noted that a simple error in a jurisdictional allegation includes failing to identify a corporation's principal place of business or referring to an individual's state of residence rather than citizenship.  See Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 301.  In McEntire v. Kmart Corp., when faced with insufficient allegations in the notice of removal -- allegations of "residence" not "citizenship" -- the Court granted the defendants leave to amend their notice of removal to cure the errors in some of the "formalistic technical requirements."  2010 WL 553443, at *8 (citing Hendrix v. New Amsterdam

Cas. Co., 390 F.2d at 300-02).   Further, in Thompson v. Intel Corp., the Court permitted the

defendant, Intel Corp., to amend its notice of removal to add missing jurisdictional elements,

including evidence that its principal place of business and corporate headquarters -- the center of

Intel Corp.'s direction, control, and coordination of activities -- is out of state, so that the diversity

requirements were met.  See 2012 WL 3860748, at *1.

There are limits to the defects that an amended notice of removal may cure, however, as

Professors Charles Alan Wright and Arthur R. Miller explain:

> [A]n amendment of the removal notice may seek to accomplish any of several
> objectives. It may correct an imperfect statement of citizenship, state the previously
> articulated grounds more fully, or clarify the jurisdictional amount.  In most
> circumstances, however, defendants may not add completely new grounds for
> removal or furnish missing allegations, even if the court rejects the first-proffered
> basis of removal, and the court will not, on its own motion, retain jurisdiction on
> the basis of a ground that is present but that defendants have not relied upon

14 C. Wright & A. Miller, Federal Practice and Procedure § 3733 (Rev. 4th ed. 2020)(footnotes

omitted).  Professor Moore has similarly recognized: "[A]mendment may be permitted after the

30-day period if the amendment corrects defective allegations of jurisdiction, but not to add a new

basis for removal jurisdiction."  16 J. Moore, D. Coquillette, G. Joseph, S. Schreiber, G. Vairo, &

C. Varner, Moore's Federal Practice § 107.30[2][a][iv], at 107-317 to -18 (3d ed. 2013).  Thus,

where the defendant asserts diversity jurisdiction as a basis for removal of an action to federal

court, the district court may permit the removing defendant to amend its removal notice, if

necessary, to fully allege facts that satisfy the requirements of diversity jurisdiction by a

preponderance of the evidence.  See Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *14

(D.N.M. 2012)(Browning, J.)(permitting party to amend its notice of removal when the removing

party did "not assert[] a new basis for jurisdiction, or a new allegation not present in its Notice of

Removal; rather, the . . . Amended Notice of Removal provides greater detail regarding the same

basis for jurisdiction asserted in the . . . Notice of Removal"). <u>Cf</u>. <u>New Mexico ex rel. Balderas v. Valley Meat Co.</u>, 2015 WL 3544288, at *25 (D.N.M. 2015)(Browning, J.)(denying amendment when it sought to assert a new jurisdictional basis that was not raised in the notice of removal).

### 4.      **Fraudulent Joinder.**

A defendant may remove a case to federal court based upon diversity jurisdiction in the absence of complete diversity if a plaintiff joins a nondiverse party fraudulently to defeat federal jurisdiction. <u>See</u> <u>Am. Nat'l Bank & Trust Co. v. Bic Corp.</u>, 931 F.2d 1411, 1412 (10th Cir. 1991); <u>Hernandez v. Menlo Logistics, Inc.</u>, 2013 U.S. Dist. LEXIS 156746, at *14-17 (D.N.M. 2013)(Browning, J.). A defendant may remove on the basis of fraudulent joinder either while the nondiverse party is still joined or after it is dismissed from the case -- the doctrine can thus function as an exception to either complete diversity or the voluntary-involuntary rule. "'[A] fraudulent joinder analysis [is] a jurisdictional inquiry,'" <u>Bio-Tec Envtl., LLC v. Adams</u>, 792 F. Supp. 2d 1208, 1214 (D.N.M. 2011)(Browning, J.)(quoting <u>Albert v. Smith's Food & Drug Ctrs., Inc.</u>, 356 F.3d 1242, 1247 (10th Cir. 2004)), and, thus, the Tenth Circuit instructs that the district court should "pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available," <u>Dodd v. Fawcett Pubs., Inc.</u>, 329 F.2d 82, 85 (10th Cir. 1964)(citations omitted). "A district court may disregard a nondiverse party named in the state court complaint and retain jurisdiction if joinder of the nondiverse party is a sham or fraudulent." <u>Baeza v. Tibbetts</u>, 2006 WL 2863486, at *3. The Supreme Court has stated: "Merely to traverse the allegations upon which the liability of the resident defendant is rested or to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith." <u>Chesapeake & Ohio Ry. Co. v. Cockrell</u>, 232 U.S. 146, 152 (1914). The Tenth Circuit has explained that allegations of fraudulent joinder complicate the analysis

whether removal is proper, because, "[w]hile a court normally evaluates the propriety of a removal by determining whether the allegations on the face of the complaint satisfy the jurisdictional requirements, fraudulent joinder claims are assertions that the pleadings are deceptive." Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x 911, 913 (10th Cir. 2006)(unpublished).

The party asserting fraudulent joinder bears the burden of proof. See Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *1 (10th Cir. 2000)(unpublished)("The case law places a heavy burden on the party asserting fraudulent joinder.").[10]  "To justify removal based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty." Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1146-47. Before 2013, the most recent published Tenth Circuit decision to state the burden of proof for demonstrating fraudulent joinder was issued over forty years earlier in Smoot v. Chicago, Rock Island & Pacific Railroad Co., 378 F.2d 879 (10th Cir. 1967).  The Tenth Circuit said that fraudulent joinder must be "established with complete certainty upon undisputed evidence." Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.

---

[10]The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592 has persuasive value.

Actual fraud -- e.g., a plaintiff colluding with a nondiverse defendant to defeat removal[11] -- suffices to establish fraudulent joinder, but it is not required.  See McLeod v. Cities Serv. Gas Co., 233 F.2d 242, 246 (10th Cir. 1956)("[C]ollusion in joining a resident defendant for the sole purpose of preventing removal . . . may be shown by any means available.").  In Smoot v. Chicago, Rock Island & Pacific Railroad Co., the Tenth Circuit stated two other bases for finding fraudulent joinder: (i) "[t]he joinder of a resident defendant against whom no cause of action is stated is a patent sham"; or (ii) "though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists."  378 F.2d at 882 (quoting Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85.  The Tenth Circuit found fraudulent joinder, because the joined party's non-liability was "established with complete certainty upon undisputed evidence."  378 F.2d at 882.  "This does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty."  Smoot v. Chi., Rock Island & Pac. R.R. Co., 378 F.2d at 882.  The plaintiff died when his car collided with a freight train.  See 378 F.2d at 881.  The plaintiff's estate sued the railroad company and joined a non-diverse alleged employee as a defendant.  See 378 F.2d at 881.  It was undisputed that the diversity-destroying party's employment with the railroad company had "terminated almost fifteen months before the collision and that he was in no way connected with the acts of negligence ascribed to him."  378 F.2d at 881.

In recent unpublished decisions, the Tenth Circuit has adopted different articulations of the

---

[11]Collusion might look something like this: a plaintiff names a nondiverse defendant under a highly dubious theory of liability; the plaintiff contacts the defendant and offers to dismiss the case at the end of the one-year limitation, see 28 U.S.C. § 1446(c), if the defendant agrees not to move to dismiss before the one-year mark; and the defendant agrees to the arrangement to save litigation costs, as well as to avoid any slim chance that the court decides to recognize the plaintiff's theory of liability against it.

burden of proof for fraudulent joinder, two of which are from the United States Court of Appeals

for the Fifth Circuit.  In Montano v. Allstate Indemnity Co., the Tenth Circuit quoted favorably

Hart v. Bayer Corp., 199 F.3d 239 (5th Cir. 2000), which states:

> To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party], in state court.  In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party.  We are then to determine whether that party has any possibility of recovering against the party whose joinder is questioned.

Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *4-5 (alterations in

original)(quoting Hart v. Bayer Corp., 199 F.3d at 246)(internal quotation marks omitted).  The

Tenth Circuit stated that the standard for proving fraudulent joinder "is more exacting than that for

dismissing a claim under Fed. R. Civ. P. 12(b)(6); indeed, the latter entails the kind of merits

determination that, absent fraudulent joinder, should be left to the state court where the action

commenced."  Montano v. Allstate Indemnity Co., 211 F.3d 1278, 2000 WL 525592, at *2.  The

Tenth Circuit in Montano v. Allstate Indemnity Co. also quoted from Batoff v. State Farm

Insurance Co., 977 F.2d 848 (3d Cir. 1992), which states: "A claim which can be dismissed only

after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be

disregarded for purposes of diversity jurisdiction."  977 F.2d at 853.

   In Nerad v. AstraZeneca Pharmaceuticals, Inc., the Tenth Circuit adopted a different

articulation of the burden of proof.  The Tenth Circuit stated that, where fraudulent joinder is

asserted, "the court must decide whether there is a reasonable basis to believe the plaintiff might

succeed in at least one claim against the non-diverse defendant."  Nerad v. AstraZeneca

Pharmaceuticals, Inc., 203 F. App'x at 913 (citing Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393

(5th Cir. 2000)).  The Tenth Circuit explained that "[a] 'reasonable basis' means just that: the claim

need not be a sure-thing, but it must have a basis in the alleged facts and the applicable law."

Nerad v. AstraZeneca Pharmaceuticals, Inc., 203 F. App'x at 913.

The Fifth Circuit recognized the inconsistencies in various articulations of the standard for fraudulent joinder and directly addressed the problem in Travis v. Irby, 326 F.3d 644 (5th Cir. 2003):

> Neither our circuit nor other circuits have been clear in describing the fraudulent joinder standard. The test has been stated by this court in various terms, even within the same opinion. For example, the Griggs [v. State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999),] opinion states,
>
> > To establish that a non-diverse defendant has been fraudulently joined to defeat diversity, the removing party must prove . . . that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court.
>
> 181 F.3d at 699 (emphasis added)(citing Burden v. Gen. Dynamics Corp., 60 F.3d 213, 217 (5th Cir. 1995)). The Griggs opinion later restates that test as follows --
>
> > Stated differently, we must determine whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the non-diverse defendant's] liability on the pleaded claims in state court.
>
> 181 F.3d at 699 (emphasis added). Similarly, in summing up federal law, Moore's Federal Practice states at one point: "To establish fraudulent joinder, a party must demonstrate . . . the absence of any possibility that the opposing party has stated a claim under state law." 16 Moore's Federal Practice § 107.14[2][c][iv][A] (emphasis added). It then comments: "The ultimate question is whether there is arguably a reasonable basis for predicting that state law might impose liability on the facts involved." Although these tests appear dissimilar, "absolutely no possibility" vs. "reasonable basis," we must assume that they are meant to be equivalent because each is presented as a restatement of the other.

326 F.3d at 647 (emphases in original). The Fifth Circuit has settled upon this phrasing:

> [T]he test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004)("To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.").

In Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d 1117 (D.N.M. 2009)(Browning, J.), the Court addressed the standard that courts should use when addressing fraudulent joinder and concluded that, to establish that a party was fraudulently joined, a defendant has the burden of demonstrating that "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined.  727 F. Supp. 2d at 1124-25 (citing Montano v. Allstate Indem. Co., 211 F.3d 1278, 2000 WL 525592, at *4-5).  The Court explained:

> [T]his District has consistently adopted the "possibility" standard when assessing fraudulent joinder claims.  See Allen v. Allstate Ins. Co., 2008 U.S. Dist. LEXIS 108948 (D.N.M. 2008)(Browning, J.)(holding that the claims asserted against the non-diverse defendant were "possibly viable under New Mexico law, and . . . sufficient to preclude federal jurisdiction"); Baeza v. Tibbetts, 2006 U.S. Dist. LEXIS 95317, at *11, (stating that "[r]emand is required if any one of the claims against [the defendant] is possibly viable"); Provencio v. Mendez, 2005 U.S. Dist. LEXIS 39012, at *25 (D.N.M. 2005)(Browning, J.)(stating that "there must be no possibility the [p]laintiffs have a claim against [the non-diverse defendant]"); Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1147 (stating that, to defeat removal jurisdiction, "[t]he plaintiff need only demonstrate the possibility of the right to relief").  This Court, in Couch v. Astec Indus., Inc., noted with approval the language of the United States Court of Appeals for the Eleventh Circuit, which states that "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." Couch v. Astec Indus., Inc., 71 F. Supp. 2d at 1147 (quoting Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998))(emphasis in original).

Zufelt v. Isuzu Motors Am., L.L.C., 727 F. Supp. 2d at 1129.

In Brazell v. Waite, the Tenth Circuit stated that the "removing party must show that the plaintiff has 'no cause of action' against the fraudulently joined defendant," but it did not further elaborate on that burden.  525 F. App'x. at 881 (citing Dodd v. Fawcett Pubs., Inc., 329 F.2d at 85; Roe v. Gen. Am. Life Ins. Co., 712 F.2d 450, 452 n.* (10th Cir. 1983)).

In 2013, the Tenth Circuit published its first opinion since 1946 regarding the burden of proof for demonstrating fraudulent joinder: "'To establish fraudulent joinder, the removing party must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249). In Dutcher v. Matheson, the Tenth Circuit reviewed a district court's holding that it had diversity jurisdiction over a case where Utah citizens sued ReconTrust, a Texas-based national bank, and Stuart T. Matheson, a Utah citizen. See 733 F.3d at 983, 987. The plaintiffs alleged that Matheson and his law firm enabled ReconTrust to conduct an illegal nonjudicial foreclosure by holding the foreclosure sales on behalf of the Texas-based bank. See 733 F.3d at 983. The defendants removed the case to federal court and alleged that the plaintiffs fraudulently joined the Utah defendants. See 733 F.3d at 983. The Honorable Ted Stewart, United States District Judge for the District of Utah, agreed that the plaintiffs had been fraudulently joined, concluding that, under Utah law, "an attorney cannot be held liable to a non-client absent fraud, collusion or privity of contract." 733 F.3d at 988. The Tenth Circuit disagreed with the district court's characterization of Utah law, finding instead that, in the case on which the defendants relied, the Supreme Court of Utah "has simply limited the circumstances in which a lawyer owes a duty of care to non-clients from actions arising out of the provision of legal services." 733 F.3d at 988. In rejecting the claim of fraudulent joinder, the Tenth Circuit said

> that does not mean that the plaintiffs have stated a valid claim against Matheson and his law firm. Or even that Matheson and his law firm are not somehow fraudulently joined. But the defendants needed to clear a high hurdle to prove something they have yet to prove, i.e., fraudulent joinder.

733 F.3d at 989.

The Tenth Circuit did not elaborate on the defendant's burden to show fraudulent joinder,

except to say that it is "a high hurdle." 733 F.3d at 989.  It quoted, however, Cuevas v. BAC Home Loans Servicing, LP, a Fifth Circuit opinion that repeats the clarified standard from the Smallwood v. Illinois Central Railroad Co. case.  See Dutcher v. Matheson, 733 F.3d at 988 (quoting Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249).  In Cuevas v. BAC Home Loans Servicing, LP, the Fifth Circuit states:

> Under the second way, the test is "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an instate defendant." [Smallwood v. Ill. Cent. R.R. Co., 385 F.3d at 573.]  If there is no reasonable basis of recovery, then the court can conclude that the plaintiff's decision to join the in-state defendant was indeed improper, unless that showing compels the dismissal of all defendants.  There is no improper joinder if the defendants' showing compels the same result for the resident and nonresident defendants, because this simply means that the plaintiff's case is ill founded as to all of the defendants.  Such a defense is more properly an attack on the merits of the claim, rather than an inquiry into the propriety of the joinder of the in-state defendant.

Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d at 249 (emphasis in original)(citations and internal quotation marks omitted).

Based on the Tenth Circuit's history of relying on Fifth Circuit analysis in fraudulent joinder cases, it is likely that it would approve this additional explanation of the fraudulent joinder standard.  The Court will accordingly use the following standard for fraudulent joinder: whether the defendant has demonstrated that there is no possibility that the plaintiff will obtain a judgment against an in-state defendant.  Cf. Zufelt v. Isuzu Motors Am., L.C.C., 727 F. Supp. 2d at 1124-25 (concluding that fraudulent joinder occurs when "there is no possibility that the plaintiff would be able to establish a cause of action" against the party alleged to be fraudulently joined).  No case sets forth the burden of proof that applies to (much rarer) allegations of actual fraud, such as plaintiff-defendant collusion, but the Court concludes that the clear-and-convincing standard -- the usual standard for fraud -- is appropriate.  See, e.g., United States v. Thompson, 279 F.2d 165, 167

(10th Cir. 1960)("An allegation of fraud is a serious matter; it is never presumed and must be proved by clear and convincing evidence.")(citations omitted).

A district court's order to remand based on a finding of fraudulent joinder is not reviewable by the Tenth Circuit. See Nerad v. AstraZeneca Pharms., Inc., 203 F. App'x at 913 (holding that, because the district court remanded based on its conclusion that it lacked subject-matter jurisdiction at the time of removal, 28 U.S.C. § 1447(d) precluded the Tenth Circuit from reviewing the order). The fraudulent joinder inquiry on a motion to remand is a subject-matter jurisdiction inquiry. See Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d at 1247.

## ANALYSIS

The Plaintiffs do not allege facts amounting to a violation of the Constitution of the United States, because qualified immunity shields Lattin and Geofreddo from suit. See Brosseau v. Haugen, 543 U.S. 194, 198 (2004)(per curiam). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. at 198. Accord Taylor v. Riojas, 141 S. Ct. 52 (2020)(same). The Court applies a two-part analysis to determine whether the Defendants in this case were entitled to qualified immunity: (i) whether the facts the Plaintiffs allege amount to a constitutional violation; and (ii) whether the constitutional right at issue was clearly established when the conduct at issue occurred. See Riggins v. Goodman, 572 at 1107. A constitutional right is clearly established where: (i) "a Tenth Circuit precedent is on point, making the constitutional violation apparent" Apodaca v. Raemisch, 864 F.3d 1071, 1076 (10th Cir. 2017); (ii) Supreme Court precedent makes the violation apparent; or (iii) "weight of authority from case law in other circuits," makes the violation apparent, id. at 1076, n.3 (citing Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003)). See Routt v. Howry, 835

F. App'x 379, 382 (10th Cir. 2020)(describing the Tenth Circuit's qualified immunity test).  In this case, Lattin and Geofreddo are entitled to qualified immunity, because they did not violate a clearly established right.  In addition, the Court will dismiss the remaining federal claims, because they do not identify the officers who committed the alleged wrongs.  See Roper v. Grayson, 81 F.3d 124, 126 (10th Cir. 1996).

**I.     THE COURT WILL DISMISS THE PLAINTIFFS' FIRST AMENDMENT CLAIM AS TO P. GUTIERREZ, BECAUSE, ALTHOUGH DOE VIOLATED P. GUTIERREZ' RIGHT TO FILM POLICE ENGAGING IN PUBLIC DUTIES, THE COMPLAINT DOES NOT GIVE FAIR NOTICE TO THE UNNAMED NEW MEXICO STATE POLICE OFFICER.**

The Plaintiffs allege that P. Gutierrez' First Amendment rights were violated, see Complaint ¶ 95, at 12, when she "tried to videotape the whole incident with her cell phone but an officer (NMSP, Deputy, Doe) grabbed her arm and told her to put the phone away and they told her to go and sit on the curb a ways away from them."  Complaint ¶ 49, at 6-7.  Although there is a clearly established right to film the police, see Apodaca v. Raemisch, 864 F.3d at 1076, n.3, the Court will dismiss the claim, because the Complaint does not identify or describe adequately a specific officer responsible for the First Amendment violation, see Roper v. Grayson, 81 F.3d at 126.

The Court concludes that there is a clearly established right to film the police conduct.  See Apodaca v. Raemisch, 864 F.3d at 1076, n.3; Complaint ¶ 49, at 6-7.  "[A]bsent controlling authority" on the issue, the Court may conclude that a clearly established right exists where there is "a robust 'consensus of cases of persuasive authority.'"  Ashcroft v. al-Kidd, 563 U.S. at 742 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).  Here, the majority of Courts of Appeals have recognized a First Amendment right to film police in public.  See Fields v. City of Philadelphia, 862 F.3d at 360; Turner v. Driver, 848 F.3d 678, 688 (5th Cir. 2017)(explaining that

"First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions"); ACLU v. Alvarez, 679 F.3d 583, 600-01 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78, 83 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000)("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995). See also Toole v. City of Atlanta, (11th Cir. 2019)(noting that the plaintiff "was engaging in constitutionally protected activities -- namely, protesting and filming police conduct -- at the time of his unlawful arrest"), Jesse Harlan Alderman, Before You Press Record: Unanswered Questions Surrounding the First Amendment Right to Film Public Police Activity, 33 N. Ill. U. L. Rev. 485, 533 (2013)(noting that "there is no authority at the circuit level or in the federal district courts that stands contrary; no federal court has expressly held that the Constitution does not protect the right"). The Tenth Circuit addressed most recently whether there is a clearly established right to film a police officer in a 2018 case describing a 2014 arrest See Sandberg v. Englewood, Colorado, 727 F. App'x 950, 963 (10th Cir. 2018)("Sandberg"). The Tenth Circuit explained that it is "not clearly established that police officers violate the First Amendment when they prevent a person who is subject to police action from filming police activities." Sandberg, 727 F. at 963. The Tenth Circuit acknowledged that "the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits have all held that 'the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public.'" Sandberg, 727 F. App'x at 963 (quoting Fields v. City of Philadelphia, 862 F.3d 353, 355-56 (3d Cir. 2017)). The Tenth Circuit held that no "clearly established weight of authority" existed, because: (i) some of the cases post-dated the events in the

case; and (ii) the cases "only involve a bystander or third party recording the police," rather than the "subject of the police action." 727 F. App'x at 963. Those concerns do not exist in this case, because the weight of authority was established before the date of the 2019 incident at issue here. The Court concludes, therefore, that Sandberg does not control the outcome here. See Sandberg, 727 F. App'x at 963. Further, P. Gutierrez was never arrested; she was a "bystander or third party recording the police," instead of an arrestee, like the plaintiff in Sandberg. See Sandberg, 727 F. App'x at 963. Consequently, the Court concludes that Doe violated P. Gutierrez' First Amendment clearly established right to film the police when he prevented her from filming her husband's arrest. See Complaint ¶ 49, at 6-7.

Nonetheless, the Court will dismiss this claim, because the Complaint does not identify or describe adequately a specific officer responsible for the First Amendment violation. See Roper v. Grayson, 81 F.3d at 126; Complaint ¶ 49, at 6-7. A plaintiff may "use unnamed defendants so long as the plaintiff provides an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served." Roper v. Grayson, 81 F.3d at 126 (collecting cases). "To avoid dismissal of unnamed defendants, a plaintiff must provide an adequate description sufficient to identify the unnamed defendants." Gose v. Bd. of Cty. Comm'rs of Cty. of McKinley, 778 F. Supp. 2d 1191, 1205 (D.N.M. 2011)(Browning, J.). Here, the Complaint does not adequately "describe the person" that P. Gutierrez claims injured her. Fisher v. Oklahoma Dep't of Corr. Unknown State Actor &/or Actors, 213 F. App'x 704, 708 n.1 (10th Cir. 2007). See Complaint ¶ 49, at 6-7. At the hearing, the Court asked the Plaintiffs whether there was a "name or specific defendant tied to the actions against Ms. Gutierrez?" Tr. at 23:7-10 (Court). The Plaintiffs admitted that "we need some discovery on that . . . . We don't know which officer or officers were responsible." Tr. at 23:11-17 (Dunn). Accordingly, the Court dismisses

P. Gutierrez' First Amendment claim without prejudice, because it does not identify or describe the officer responsible.  See Roper v. Grayson, 81 F.3d at 126.  The Court dismisses the federal claims against the John and Jane Does without prejudice, in case the Plaintiffs are able to identify them in the future.

## II.     THE COURT WILL DISMISS THE FALSE ARREST CLAIM, BECAUSE GEOFREDDO AND LATTIN HAD PROBABLE CAUSE TO ARREST R. GUTIERREZ FOR DRIVING WHILE INTOXICATED.

Where a plaintiff "has been imprisoned without legal process he has a claim under the Fourth Amendment analogous to a tort claim for false arrest or false imprisonment." Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008).   "A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018). Similarly, New Mexico law defines false imprisonment as "intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." N.M.S.A. § 30-4-3. "In New Mexico, 'an essential element of [false arrest] is a lack of probable cause.'" Mocek v. City of Albuquerque, 3 F. Supp. 3d 1002, 1082 (D.N.M. 2014)(quoting Jackson v. N.M. Pub. Defender's Office, 361 F. App'x 958, 964 (10th Cir. 2010)), aff'd, 813 F.3d 912 (10th Cir. 2015).  "An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 143 N.M. 84, 88, 173 P.3d 6, 10.[12]  See State v. Johnson, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54

---

[12]The Court predicts the Supreme Court of New Mexico would agree with Santillo v. N.M. Dep't of Pub. Safety because, that case's conclusion is consistent with the Supreme Court of New Mexico's case law.  See State v. Johnson, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54.

(explaining that "common-law defense to a civil wrongful arrest or a false imprisonment suit also requires only that the officer prove . . . that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances").  Under New Mexico law, "the warrantless arrest of one suspected of committing DWI is valid when supported by both probable cause and exigent circumstances."  City of Santa Fe v. Martinez, 2010-NMSC-033, ¶ 16, 148 N.M. 708, 713, 242 P.3d 275, 280.  The Supreme Court of New Mexico has emphasized the "strong public interest in deterring the crime of DWI."  City of Santa Fe v. Martinez, 2010-NMSC-033, ¶ 15, 148 N.M. 708, 713, 242 P.3d 275, 280.  Regarding a police officer's duty in a DWI arrest, the Supreme Court of New Mexico has stated: "Because evidence of intoxication fades over time, officers must promptly locate and investigate an individual suspected of DWI."  City of Las Cruces v. Sanchez, 2009-NMSC-026, ¶ 15, 146 N.M. 315, 318, 210 P.3d 212, 215.

In this case, there was probable cause to arrest R. Gutierrez based on the facts stated in the Complaint, even absent the partial video of the arrest to which the Plaintiffs link and rely frequently upon in the Complaint, because the events took place in a wine festival parking lot, and R. Gutierrez behaved and drove erratically.[13]  See Complaint ¶¶ 65-74, at 8-9.  New Mexico law prohibits a person from driving a vehicle "if the person has an alcohol concentration of eight one hundredths or more in the person's blood or breath within three hours of driving the vehicle and the alcohol concentration results from alcohol consumed before or while driving the vehicle."  N.M.S.A. § 66-8-102(c)(1).  Although, the Plaintiffs allege that R. Gutierrez passed the field sobriety tests, see  Complaint ¶ 55, at 7 (alleging that "Deputy Geofreddo conducted Standardized

---

[13]"Even assuming the officers lacked actual probable cause to arrest" R. Gutierrez, "the officers are entitled to qualified immunity because they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'"  District of Columbia v. Wesby, 138 S. Ct. at 591 (alterations in District of Columbia v. Wesby)(quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))

Field Sobriety Tests on Ray, immediately after removing him from the vehicle, and Ray passed the fields"), other facts show that Geofreddo had probable cause to believe that R. Gutierrez drove while intoxicated.  See Complaint ¶¶ 26-32, at 4.  First, these events took place in the parking lot of the Santa Fe Chili and Wine Festival.  See Complaint ¶ 10, at 2.  Second, Gutierrez "screamed" at his family members to "hurry up and get into the car."  Complaint ¶ 26, at 4.  Third, Gutierrez "jumped into the driver's seat of the car, attempting to nervously drive the family away," and "scraped the car next to him . . . ."  Complaint ¶ 27, at 4.   Gutierrez thereafter approached Geofreddo.  Complaint ¶ 32, at 5.  Erratic behavior, screaming, and colliding with another vehicle while driving after a wine-focused event provided Deputy Geofreddo with probable cause to arrest Gutierrez.  See State v. Vargas, 2017-NMSC-029, ¶ 21, 404 P.3d 416, 422 (concluding that an officer had probable cause to believe that a driver "had driven a motor vehicle while under the influence of alcohol or a controlled substance," where the driver smelled of alcohol, denied she had been drinking, behaved in a "confused" and "nervous" manner, and "performed poorly" on field sobriety tests); Schuster v. State Dep't of Taxation & Revenue, Motor Vehicle Div., 2012-NMSC-025, ¶¶ 30-31, 283 P.3d 288, 296-97 (finding that an officer had probable cause to arrest an arrestee for DWI where the officer observed the arrestee "driving a motorcycle when the motorcycle fell over on its side before" the arrestee "reached the roadway," and the arrestee "performed poorly" on field sobriety tests).  Moreover, New Mexico law requires that a DWI arrest "must take place with reasonable promptness from the time of the accident."  City of Las Cruces v. Sanchez, 2009-NMSC-026, ¶ 16, 146 N.M. 315, 319, 210 P.3d 212, 216.  This further bolsters the Court's conclusion that the officers did not violate R. Gutierrez' constitutional rights when they arrested him.  See City of Las Cruces v. Sanchez, 2009-NMSC-026, ¶ 16, 146 N.M. 315, 319, 210 P.3d 212, 216.

When the Court considers the video of R. Gutierrez' arrest cited in the Complaint, the evidence demonstrating probable cause to arrest R. Gutierrez is even stronger.  See Complaint ¶ 65, at 8 (proving a link to the video).  In addition to the facts discussed above, in the video, R. Gutierrez initially tells the officers he is not sure how much he had to drink.  See R. Gutierrez Arrest Video at 0:39.  After deputies ask R. Gutierrez again how much he had to drink, he states "I don't know" but estimates that he consumed five samples of wine at the festival.  R. Gutierrez Arrest Video at 0:44.  A. Tapia also attempts to pretend that he, rather than R. Gutierrez, was driving the vehicle.  See R. Gutierrez Arrest Video at 1:00.  R. Gutierrez also informs an officer that he was carrying a concealed firearm while drinking.  See R. Gutierrez Arrest Video at 1:30. See also N.M.A.C. 10.8.2.16(b)("No person shall consume alcohol while carrying a concealed handgun."); N.M.A.C. 10.8.2.16(c)("No person shall carry a concealed handgun while impaired by the use of alcohol, controlled substances, or over-the-counter or prescribed medications.").  R. Gutierrez also took a breathalyzer test, and had a blood alcohol concentration of 0.10%.  See R. Gutierrez Arrest Video at 1:42.  In New Mexico, the legal limit of blood alcohol concentration for driving a vehicle is 0.08%.  See N.M.S.A. § 66-8-102(c)(1).  Because R. Gutierrez admitted that he had been drinking before he was driving, was unsure how much alcohol he had consumed, admitted to carrying a firearm while drinking, and had a blood alcohol concentration above the legal limit, the video supports the Court's conclusion that there was probable cause to arrest R. Gutierrez.  See State v. Vargas, 2017-NMSC-029, ¶ 21, 404 P.3d 416, 422; Schuster v. State Dep't of Tax'n & Revenue, Motor Vehicle Div., 2012-NMSC-025, ¶¶ 30-31, 283 P.3d 288, 296-97; City of Las Cruces v. Sanchez, 2009-NMSC-026, ¶ 16, 146 N.M. 315, 319, 210 P.3d 212, 216. Accordingly, there is no Fourth Amendment claim on the basis of false arrest or imprisonment. See District of Columbia v. Wesby, 138 S. Ct. at 591.

III.    THE COURT WILL DISMISS LATTIN AS A DEFENDANT, BECAUSE THE
        COMPLAINT DOES NOT ALLEGE PLAUSIBLY THAT LATTIN VIOLATED A
        <u>CONSTITUTIONAL RIGHT</u>.

The Plaintiffs' claim must "make clear exactly *who* is alleged to have done *what* to *whom,*

to provide each individual with fair notice as to the basis of the claims against him or her, as

distinguished from collective allegations against the state." <u>Robbins v. Oklahoma</u>, 519 F.3d at

1250 (emphasis in original). Here, the Complaint references specifically Deputy Lattin on just

four occasions:

> Defendant Deputy Sheriff Blaine Lattin is employed by the Santa Fe County
> Sheriffs [sic] Department and was on duty and acting under color of state law at all
> times relevant to the Complaint.
>
> . . . .
>
> Defendant Deputy Geofreddo was not talking to the victims (family) [sic],
> they were all being ignored while he spoke with Ray and Defendant Deputy Lattin,
> other Deputies and State Police Officers.
>
> . . . .
>
> All the other state' s witnesses stated that they did not have lapel cameras
> at the event, which meant there should not have been any other videos besides
> Deputy Geofreddo and Deputy Lattin (**DWI** arresting officer).
>
> . . . .
>
> Defense counsel for Ray Gutierrez only received Deputy Lattin's video.

Complaint ¶¶ 7, 40, 72-73, at 2-9 (bold in original). <u>See</u> Tr. at 12:22-13:4 (Dickman)("There were

two substantive allegations about Lattin. He had a conversation with other deputies . . . . And he

was . . . the DWI arresting officer."). At the hearing, the Plaintiffs argued that "Deputy Lattin is

the arresting officer. He's the one who took culpability for the arrest and prosecution. We know

those are the two facts that are directly attributable . . . ." Tr. at 18:20-25 (Dunn). The Complaint,

however, states only that "the Defendants engaged in acts or omissions that resulted in the

commission of malicious prosecution, abuse of process . . . ." Complaint ¶ 95, at 12. "[T]his

section of the complaint fails to differentiate among individual defendants and specify which defendants are alleged to have taken which particular actions." Robbins v. Oklahoma, 519 F.3d 1242, 1253 (10th Cir. 2008). The only specific allegation as to Lattin, then, is the false arrest claim. See Complaint ¶ 72, at 9. As the Court discussed above, however, there was probable cause to arrest R. Gutierrez, and, therefore, the Court will dismiss this claim. See Analysis § II.

Regarding the remaining allegations, "[g]iven the complaint's use of either the collective term 'Defendants' . . . with no distinction as to what acts are attributable to whom, it is impossible for" Lattin "to ascertain what particular unconstitutional acts" he is "alleged to have committed." Robbins v. Oklahoma, 519 F.3d at 1250. Yet, "[a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). Moreover, the Defendants' collective allegations do not satisfy rule 8(a) of the Federal Rules of Civil Procedure, because they do not demonstrate "that the pleader is entitle to relief." Fed. R. Civ. P. 8(a)(2). The Court, therefore, dismisses Lattin as a Defendant in this action.

## IV. THE COURT WILL DISMISS GEOFREDDO AS A DEFENDANT, BECAUSE THE COMPLAINT DOES NOT ALLEGE PLAUSIBLY THAT GEOFREDDO VIOLATED A CONSTITUTIONAL RIGHT.

The Plaintiffs do not state a claim for which relief can be granted against Geofreddo. See Complaint ¶¶ 68-75, at 8-9. First, as the Court explained above, see Analysis § II, supra, the Complaint does not state a plausible false arrest claim either as to Geofreddo or as to Lattin, see Robbins v. Oklahoma, 519 F.3d at 1248 (explaining that the plausibility requirement "serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them"). The Complaint also discusses Geofreddo's conduct on several other occasions; most of these references do not implicate Constitutional issues. See Complaint ¶¶ 68-75, at 8-9. For

example, the Complaint alleges that Geofreddo "began to get angry and agitated at Patricia, Allan and Briana as they were crying and trying to explain what had just happened and to get law enforcement to investigate the attack." Complaint ¶ 36, at 5. A police officer's angry demeanor alone does not violate any right that the United States Constitution preserves.[14] Similarly, the Complaint alleges that "Geofreddo was not talking to the victims (family) [sic], [and] they were all being ignored while he spoke with Ray and Defendant Deputy Lattin, other Deputies and State Police Officers." Complaint ¶ 36, at 6. Again, it is unclear what constitutional right these alleged actions violate. See Complaint ¶ 36, at 6.

Taking a charitable view of the Complaint, the Court concludes that the Complaint also links Geofreddo to the malicious prosecution claims, by alleging that, during interviews preceding R. Gutierrez' trial:

> Deputy Sheriff Geofreddo advised that the video that was aired on the October 22, 2019 on the local news story was his lapel video taken of the Ray's arrest.
>
> When Mr. Archuleta asked Deputy Geofreddo where his lapel video was, he stated he turned it into evidence.
>
> Deputy Geofreddo stated that he did not know how the news outlets obtained the video but suggested that there must have been a request for the video made to the Sheriff's department.
>
> Deputy Geofreddo did state during this interview that he saw Ray's wife, Plaintiff Patricia Gutierrez and Ray's daughter, Plaintiff Briana Tapia, both running toward the car where Ray was located and that they both appeared to be in great fear.
>
> All the other state's witnesses stated that they did not have lapel cameras at the event, which meant there should not have been any other videos besides Deputy Geofreddo and Deputy Lattin (DWI arresting officer).
>
> Defense counsel for Ray Gutierrez only received Deputy Lattin's video.
>
> However, it was reported on KVIA news station that they had seen three

_____

[14]The Court might, however, consider a police officer's demeanor as a factor when evaluating whether he or she violated a constitutional right.

videos in total.  ADA Richard  Wilson stated to Mr. Archuleta that the DA' s Office had  not received Deputy Geofreddo' s video; however, as soon as they received it, they would provide  it to defense counsel.

At the conclusion of  the  pre-trial  interviews,  ADA Richard  Wilson conceded  to defense counsel that because of Deputy Geofreddo witnessing Patricia and Briana running in fear towards the car where Ray was located and confirming the defense' s duress defense -- that the DA's Office would be dropping the DWI charge.

Complaint ¶¶ 68-75, at 8-9.  Although the Plaintiffs may bring a malicious prosecution claim under

42 U.S.C. § 1983, they do not allege plausibly such a claim against Geofreddo.  See Complaint

¶¶ 68-75, at 8-9.[15]  The Supreme Court has held that "the Fourth Amendment governs a claim for

unlawful pretrial detention even beyond the start of legal process."  Manuel v. City of Joliet, Ill.,

137 S. Ct. 911, 920 (2017).  "Common-law malicious prosecution requires showing, in part, that

a defendant instigated a criminal proceeding with improper purpose and without probable cause."

McDonough v. Smith, 139 S. Ct. 2149, 2156 (2019)(citing Restatement (Second) of Torts § 653).

A § 1983 malicious prosecution claim has five elements: (i) the defendant caused the plaintiff's

continued confinement or prosecution; (ii) the original action terminated in the plaintiff's favor;

(iii) no probable cause supported the original arrest, continued confinement, or prosecution;

(iv) the defendant acted with malice; and (v) the plaintiff sustained damages.  See Wilkins v.

DeReyes, 528 F.3d 790, 799 (10th Cir. 2008)("Wilkins").  The Court concludes that the Plaintiffs

have not stated a malicious prosecution claim as to Geofreddo, because they have not satisfied the

first, third, and fourth malicious prosecution elements.  See Complaint ¶¶ 68-75, at 8-9.

Regarding the first element, nowhere does the Complaint allege that Geofreddo caused R.

---

[15]The Plaintiffs never reference 42 U.S.C. § 1983 in the Complaint, although they reference multiple violations of the Constitution of the United States.  The Court presumes, therefore, that they intend to bring their federal claims pursuant to  § 1983.

Gutierrez' continued confinement or prosecution.  See Wilkins, 528 F.3d at 799.  The Complaint satisfies the second element, however, because it alleges that the DA's Office formally dismissed the case, "because the case lost all its probable cause witnesses."  Complaint ¶ 83, at 10.[16]  See Restatement (Second) of Torts § 659(c) ("Criminal proceedings are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor.").  With respect to the third element, the Court has explained that there was probable cause to arrest R. Gutierrez. See Analysis § II, at 48.  Fourth, the Complaint does not allege that Geofreddo acted with malice towards R. Gutierrez, and nothing in the Complaint indicates that Geofreddo possessed "a primary motive in the use of process to accomplish an illegitimate end."  Durham v. Guest, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 701, 204 P.3d 19, 26.  See Wilkins, 528 F.3d at 799.  Fifth, the Complaint satisfies the damages element, because it alleges that the malicious prosecution at issue "resulted in the deprivations of their rights, the inability of Plaintiff to engage in his chosen profession as an officer of the Court and caused a loss of reputation as a result of his being falsely charged and prosecuted without probable cause."  Complaint ¶ 94, at 12-13.  Because the Complaint does not satisfy three of the five malicious prosecution elements, however, the Court will dismiss the malicious prosecution claim against Geofreddo. See, e.g., Crudup v. Schulte, 12 F. App'x 682, 685-86 (10th Cir. 2001)(concluding, on a motion to dismiss, that "even accepting that [the

---

[16]The State court Notice of Dismissal provides:

State of New Mexico, by and through Assistant District Attorney Richard T. Wilson, dismisses this case without prejudice.  The stopping deputy has been suppressed along with all evidence which his testimony could impeach. Without the stopping officer and the related evidence State cannot proceed to trial. Therefore, State dismisses this matter.

State v. Gutierrez, No. M-49-FR-2019-01171, Notice of Dismissal, filed January 6, 2020 (no document number).

defendant's alleged acts of racial bias] gave rise to a cognizable § 1983 claim for malicious prosecution, in this case [a] finding of probable cause . . . is fatal to the claim"); McGarry v. Bd. of Cty. Commissioners for Cty. of Lincoln, 294 F. Supp. 3d at 1201 ("To prevail on his malicious prosecution claims, [the plaintiff] must demonstrate that the Officers did not have probable cause for the charges brought."); King v. Knoll, 399 F. Supp. 2d 1169, 1179 (D. Kan. 2005)(Robinson, J.)(explaining that the "Plaintiff cannot survive a summary judgment motion on her malicious prosecution claim, because plaintiff cannot show under any circumstances, that defendants instituted, procured, or continued a criminal proceeding without probable cause.").  Moreover, the Court dismisses the federal claims against Geofreddo and Lattin with prejudice, because, at the hearing, the Court asked the Plaintiffs whether there were "any facts that you now know and now that you're in federal court you would put in this complaint that's not in there that I ought to be considering when I decide whether you state a cause of action under federal law?" and the Plaintiffs replied that there were no additional facts that the Court should consider.  Tr. at 21:8-12 (Court, Dunn).

## IV. THE COURT LACKS JURISDICTION OVER THE STATE TORT CLAIMS, BECAUSE THERE ARE NO REMAINING FEDERAL CLAIMS.

Because the Complaint does not state any plausible federal claims, see Analysis §§ I-III, supra, the Court must remand the case because it lacks jurisdiction.[17]  "When all federal claims

---

[17] The Eleventh Amendment of the United States Constitution grants New Mexico immunity from suit in federal court.  See U.S. Const. Amend. XI.  There are two exceptions to Eleventh Amendment immunity: (i) "a state may consent to be sued"; and (ii) "Congress may clearly and expressly abrogate the state's immunity."  Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior, 160 F.3d 602, 607 (10th Cir. 1998).  In the NTMCA, New Mexico consents to be sued for certain torts in state court only.  See N.M.S.A. § 41-4-18(a).  Accordingly, "NMTCA's immunity-waiver provisions, N.M. Stat. Ann. §§ 41-4-5 to -12, do not waive New Mexico's Eleventh Amendment immunity."  Gallegos v. Bernalillo Cty. Bd. of Commissioners, No. CV 16-0127 JB/WPL, 2017 WL 3575883, at *36 (D.N.M. Aug. 17, 2017)(Browning, J.).  "The NMTCA

have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998).  Specifically, where "the federal claims are dismissed before trial . . . the state claims should be dismissed as well." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  The Court has dismissed the federal claims here at the motion to dismiss stage. See Analysis §§ I-III, supra.  Consequently, "[r]esolving the remaining state claims would require the Court to unnecessarily make decisions of state law." Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1316 (D.N.M. 2015)(Browning, J.).   Accordingly, the Court remands the remaining state law claims to the First Judicial District Court, County of Santa Fe, State of New Mexico.

　　　**IT IS ORDERED** that: (i) the Motion to Dismiss Complaint Based on Qualified

---

preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived." Fernandez v. Mora-San Miguel Elec. Co-op., Inc., 462 F.3d 1244, 1250 (10th Cir. 2006)("Fernandez").  Here, the Complaint identifies the Defendants as "employees . . . on duty and acting under color of state law," Complaint ¶¶ 6-9, at 1; the NTMCA, therefore, maintains Eleventh Amendment immunity for the Defendants, see Fernandez, 462 F.3d at 1250.

　　　True, the NTMCA waives immunity for certain torts "caused by law enforcement officers while acting within the scope of their duties." N.M.S.A. § 41-4-12.  Nonetheless, New Mexico law provides: "Exclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico." N.M.S.A. § 41-4-18(a).  New Mexico's consent to suit under the NMTCA, therefore, is "limited to actions commenced in the state district courts." Bishop v. John Doe 1, 902 F.2d 809, 810 (10th Cir. 1990). See Serrano v. New Mexico, No. 17-CV-01156-RB-SCY, 2018 WL 2723781, at *5 (D.N.M. June 6, 2018)(Brack, J.)("Nothing in the New Mexico Tort Claims Act waives Defendant State of New Mexico's Eleventh Amendment sovereign immunity from suit.").  Consequently, the Court remands the Plaintiffs' claims under the NMTCA to the First Judicial District Court, County of Santa Fe, State of New Mexico. See Bishop v. John Doe 1, 902 F.2d at 810; Flores v. Long, 926 F. Supp. 166, 167-68 (Hansen, J.)(D.N.M. 1995)(holding that, because "New Mexico has not waived its Eleventh Amendment immunity from suit in federal court," the United States District Court for the District of New Mexico lacks jurisdiction over NMTCA claims, and that the "claims must be remanded to the state court from which they were removed"); Notice of Removal at 1, filed May 26, 2020 (Doc. 1).

Immunity, filed June 2, 2020 (Doc. 7), is granted; (ii) all federal claims against Defendants Blaine

Lattin and Justin Geofreddo are dismissed with prejudice; (iii) all remaining federal claims are

dismissed without prejudice; (iv) the remaining state claims and the case are remanded to First

Judicial District Court, County of Santa Fe, State of New Mexico; and (v) the Court will enter a

separate Final Judgment in this matter.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

A. Blair Dunn
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

     *Attorney for the Defendants*